UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Ulber Morales, Julio Olivar, Hisai Ramirez, Alejandro Rodriguez, Cristian Ramirez, and Misael Morales <br><br> Plaintiffs, <br> v. <br><br> Gourmet Heaven, Inc., Yong Cho, and Chung Cho <br><br> Defendants | CIVIL ACTION NO: 3:14-cv-01333-VLB <br><br><br> April 15, 2016 |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL CIVIL RULE 56.1**

**Defendants Gourmet Heaven, Inc. and Chung Cho**

1.   Gourmet Heaven, Inc. ("Gourmet Heaven") is a domestic corporation incorporated in Connecticut with a business address of 15 Broadway in New Haven, Connecticut.  Ex. 1 (Amended Compl.) ¶ 11; Ex. 2 (Def.'s Ans.) ¶ 11.

2.   Gourmet Heaven did more than $500,000 in business and operated in interstate commerce.  Ex. 1 (Amended Compl.) ¶ 13; Ex. 2 (Def.'s Ans.) ¶ 13.

3.   Chung Cho was at all relevant times the owner of Gourmet Heaven, its agent for the service of process, and was present at Gourmet Heaven's New Haven locations almost every day of the year.  Ex. 1 (Amended Compl.) ¶¶ 16-20; Ex. 2 (Def.'s Ans.) ¶¶ 16-20.

1

4. Chung Cho personally hired all of the managers and supervisory staff at the New Haven Gourmet Heaven locations.  Ex. 1 (Amended Compl.) ¶ 20; Ex. 2 (Def.'s Ans.) ¶ 20.

5. Mr. Cho personally paid employees, kept records of that pay, conducted salary negotiations with employees, and was in charge of employee scheduling.  Ex. 3 (Affidavit of Cristian Lopez Ramirez) ¶¶ 5,6; Ex. 4 (Affidavit of Hisai Ramirez) ¶¶ 5, 6; Ex. 5 (Affidavit of Misael Morales) ¶¶ 5-7; Ex. 6 (Affidavit of Julio Olivar) ¶¶ 5-7; Ex. 7 (Affidavit of Ulber Morales) ¶¶ 6-8.

6. Mr. Cho invested the funds required to establish the business, negotiated the lease of the business, conducted all the banking and other financial affairs of the business, and conducted the day-to-day affairs of the business.   Ex. 8 (Cho v. Ryung Hee Cho Complaint) ¶ 9.

7.  Mr. Cho himself negotiated the sale of the business and all of the assets.  Ex. 9 (Documents related to Gourmet Heaven Sale).

**DOL Investigation**

8. In June of 2013, the Connecticut Department of Labor began investigating Gourmet Heaven for alleged wage and hour violations after a complaint from Plaintiff Ulber Morales.  Ex. 10 (Affidavit of Blair Bertaccini) ¶¶ 2, 3.

9. Once Defendant Chung Cho learned of DOL complaint, he sent other workers to convince Ulber Morales to withdraw the complaint.  Ex. 3 (Affidavit of Cristian Lopez Ramirez) ¶¶ 7, 8; Ex. 7 (Affidavit of Ulber Morales) ¶ 9.

10.     Defendant Cho told employees that if Mr. Morales did not withdraw the complaint, police and immigration authorities would arrest and detain them. Ex. 3 (Affidavit of Cristian Lopez Ramirez) ¶¶8-10; Ex. 5 (Affidavit of Misael Morales) ¶ 8.

11.     Defendant Chung Cho and other managers told workers to lie about how much they had earned in order to frustrate the investigation.  Ex. 3 (Affidavit of Cristian Lopez Ramirez) ¶ 10;  Ex. 4 (Affidavit of Hisai Ramirez) ¶ 7; Ex. 6 (Affidavit of Julio Olivar) ¶ 9; Ex. 11 (Affidavit of Alejandro Rodriguez) ¶ 8.

12.     Chung Cho and other managers told employees to run out the back door of Department of Labor investigators arrived at the store.  Ex. 4 (Affidavit of Hisai Ramirez) ¶ 7; Ex. 5 (Affidavit of Misael Morales) ¶ 9; Ex. 6 (Affidavit of Julio Olivar) ¶ 9; Ex. 11 (Affidavit of Alejandro Rodriguez) ¶ 8.

13.     Blair Bertaccini, who had worked as a wage and hour investigator and subsequently as a wage enforcement agent for twenty-five years, was in charge of the investigation.  Ex. 6 (Affidavit of Blair Bertaccini) ¶¶ 2, 3.

14.     Mr. Bertaccini found that the Defendants did not post the legally-required notices of wage and hour rights or otherwise inform employees of their wage and hour rights.  Ex. 7 (Affidavit of Blair Bertaccini) ¶ 7.

15.     Mr. Bertaccini also found that the Defendants paid the Plaintiffs, all of whom were employees, in cash.  Ex. 7 (Affidavit of Blair Bertaccini) ¶ 7.

16.     At the beginning of the investigation, Defendant Chung Cho produced employment records of only a limited group of employees.  Ex. 7 (Affidavit of Blair Bertaccini) ¶ 9.

17. Mr. Bertaccini found out through his investigation that there were more employees working at night, and at another Gourmet Heaven location, for whom Defendant Chung Cho had produced no records. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 9.

18. When Mr. Bertaccini asked for records for those employees, Defendant Cho finally produced those, as well. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 9.

19. During his investigation, Mr. Bertaccini audited handwritten records Mr. Cho maintained for his employees, including the Plaintiffs. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 10.

20. These records recorded cash payments made to the employees and sometimes included weekly totals of hours. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 10.

21. At times Mr. Bertaccini relied on his experience and questioning of Defendant Chung Cho as to exactly what the records indicated. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 10.

22. Mr. Bertaccini determined that the employment records maintained by Mr. Cho were incomplete and out of compliance with state law standards. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 11.

23. Nevertheless, Mr. Bertaccini was able to determine how many hours each employee worked and how much they were paid during the period covered by the audit. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 11.

24. After performing the audit, Mr. Bertaccini counseled Mr. Cho about how to comply with state overtime law going forward. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 12.

25. He also transcribed the data on to a wage transcription sheet which calculated the overtime wages owed to each employee. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 13; Ex. 12 (Wage Transcription and Computation Sheet).

26. After concluding the initial investigation, counseling Defendants on compliance, and producing a transcription sheet that quantified the amounts owed to each employee, Mr. Bertaccini was informed that Defendants continued to violate the overtime and record-keeping law. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 14, 15.

27. Mr. Bertaccini determined that the Defendants continued to pay overtime hours in cash, and without an overtime premium. Ex. 7 (Affidavit of Blair Bertaccini) ¶ 15.

28. This was only the second time in his career as a wage enforcement agent that an employer continued to commit wage and hour violations while having an open case for the same types of offenses. Ex. 7 (Affidavit of Blair Bertaccini) ¶¶ 12, 15.

**Wage and Hour Violations Found**

29. Plaintiff Ulber Morales worked for Defendants from July, 2011 through January, 2012 for a total of 25 weeks. Ex. 7 (Affidavit of Ulber Morales) ¶ 2; Ex. 12 (Wage Transcription and Computation Sheet).

30.     Defendants paid Mr. Morales as little as $300 for 72 hours of work in a week, and never more than $425 for 72 hours of work.  Ex. 12 (Wage Transcription and Computation Sheet).

31.      The first audit by the Connecticut Department of Labor revealed that Defendants underpaid Mr. Morales by $8,291.  Ex. 10 (Affidavit of Blair Bertaccini) ¶ 14.

32.     According to that audit, Mr. Morales worked 72 hours in each and every week during that 25 weeks.  Ex. 12 (Wage Transcription and Computation Sheet).

33.     On average, Defendants underpaid Mr. Morales by $331.64 per week.  Ex. 12 (Wage Transcription and Computation Sheet).

34.     Plaintiff Julio Olivar worked for Defendants from June 4, 2006 until December 21, 2013, for a total of 550 weeks.  Ex. 6 (Affidavit of Julio Olivar) ¶ 2; Ex. 12 (Wage Transcription and Computation Sheet).

35.     The first audit by the Connecticut Department of Labor revealed that during 2011, Mr. Olivar was paid as little as $500 for 72 hours of work in a week.  Ex. 12 (Wage Transcription and Computation Sheet).

36.     That audit also revealed that over a two-year period, Defendants underpaid Mr. Olivar by $7,163.63.  Ex. 10, (Affidavit of Blair Bertaccini) ¶ 14.

37.     During the period of that audit, Defendants underpaid Mr. Olivar an average of $68.62 per week.  Ex. 12 (Wage Transcription and Computation Sheet)

38. According to that audit, Mr. Olivar worked 72 hours almost each and every week. Ex. 12 (Wage Transcription and Computation Sheet).

39. The subsequent audit revealed a further underpayment of $2,152.92. Ex. 10 (Affidavit of Blair Bertaccini) ¶ 15.

40. Defendants underpaid Mr. Olivar at that average rate of $68.82 for 550 weeks, they underpaid him by a total of $37,851 during his tenure. Ex. 12 (Wage Transcription and Computation Sheet).

41. Plaintiff Hisai Ramirez worked from the week of January 2012 until December 2013. Ex. 4 (Affidavit of Hisai Ramirez) ¶ 2.

42. The first audit by the Connecticut Department of Labor revealed that Mr. Ramirez was paid as little as $380 for 60 hours of work in a week. Ex. 12 (Wage Transcription and Computation Sheet) ¶ 14.

43. That audit also revealed that over a two year period, Defendants underpaid Mr. Ramirez by $12,024.00. Ex. 4 (Affidavit of Hisai Ramirez) ¶ 14.

44. According to that audit, Mr. Ramirez worked 60 hours each and every week. During the period of that audit, 94 weeks in his case, Defendants underpaid Mr. Ramirez by an average of $127.91 per week. Ex. 12 (Wage Transcription and Computation Sheet).

45. The subsequent audit revealed another $144 in violations, for a total of $12,168 in state wage and hour violations. Ex. 10 (Affidavit of Blair Bertaccini) ¶ 15.

46. Plaintiff Alejandro Rodriguez worked for Defendants from March 2003 through at least September of 2014. Ex. 11 (Affidavit of Alejandro Rodriguez) ¶¶ 5, 6.

47. When Mr. Rodriguez began working for Gourmet Heaven in March, 2003, he was paid at a rate of $3.33 per hour. Ex. 11 (Affidavit of Alejandro Rodriguez) ¶ 7.

48. The first audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Rodriguez by $25,708. Ex. 10 (Affidavit of Blair Bertaccini) ¶ 14.

49. During the period of the first audit, Mr. Rodriguez was paid as little as $392 for sixty hours of work. Ex. 12 (Wage Transcription and Computation Sheet).

50. According to that audit, Mr. Rodriguez worked 72 hours per week almost every single week. Ex. 12 (Wage Transcription and Computation Sheet).

51. During the period of the audit, Defendants underpaid Mr. Rodriguez an average of $247.19 per week. Ex. 12 (Wage Transcription and Computation Sheet).

52. The subsequent audit revealed a further underpayment of $1,496.32, for a total of $27,204.32. Ex. 10 (Affidavit of Blair Bertaccini) ¶ 15.

53. Because Defendants underpaid Mr. Rodriguez at a rate of $247.19 per week for the 565 weeks between the date he started working for Defendants and the end of the last DOL audit, they underpaid him by a total of $139,662.35. Ex. 12 (Wage Transcription and Computation Sheet).

54. Plaintiff Cristian Ramirez worked for Defendants from September 1, 2010 under December 21, 2013.  Ex. 3 (Affidavit of Cristian Lopez Ramirez) ¶ 2.

55. An audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Ramirez by $14,982.50.  Ex. 10 (Affidavit of Blair Bertaccini) ¶ 14.

56. During that period, Mr. Ramirez was paid as little as $325 for sixty hours of work.  Ex. 12 (Wage Transcription and Computation Sheet).

57. During that period, Mr. Ramirez worked sixty hours per week almost every single week.  Ex. 12 (Wage Transcription and Computation Sheet).

58. Defendants underpaid Mr. Rodriguez an average of $144.06 per week.  A subsequent audit revealed a further underpayment of $190, for a total of $15,172.50.  Ex. 12 (Wage Transcription and Computation Sheet); Ex. 10 (Affidavit of Blair Bertaccini) ¶ 15.

59. Defendants underpaid Mr. Rodriguez at a rate of $144.06 per week during the 172 weeks between the date he started working for Defendants and the end of the last DOL audit, and underpaid him by a total of $24,778.32.  Ex. 12 (Wage Transcription and Computation Sheet).

60. Plaintiff Misael Morales worked from June 1, 2009 until December 21, 2013.  Ex. 5 (Affidavit of Misael Morales) ¶ 2.

61. An Audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Morales by $15,546.75.  Ex. 10 (Affidavit of Blair Bertaccini) ¶14.

62.     During that period, Mr. Morales was paid as little as $335 for sixty hours a week of work.  Ex. 12 (Wage Transcription and Computation Sheet).

63.     During the audit period, Mr. Morales worked 60 hours each and every week.  Defendants underpaid Mr. Morales by an average of $148.49 per week.  Ex. 12 (Wage Transcription and Computation Sheet).

64.     A subsequent audit revealed a further underpayment of $160, for a total of $15,706.75.  Ex. 10 (Affidavit of Blair Bertaccini) ¶14.

65.     Defendants underpaid Mr. Mr. Morales $148.49 per week for his entire tenure of 237 weeks, and therefore underpaid him by a total of $35,192.13.  Ex. 12 (Wage Transcription and Computation Sheet).

**Aftermath of the DOL Investigation**

66.     Immediately following the second DOL audit, in  December of 2015, a manager warned Alejandro Rodriguez not to attend meetings of Unidad Latina en Acción, and was told by a manager that if he continued to go to the meetings Chung Cho would tell him "'there's no more work for you,' if you don't go again, he will treat you well."  Ex. 11 (Affidavit of Alejandro Rodriguez)  ¶¶ 9, 10.

67.      Upon eventually learning of Alejandro Rodriguez's continued participation in meetings with Unidad Latina en Acción, and the fact that Mr. Rodriguez himself had complained about his substandard wages, Defendants reduced Mr. Rodriguez's hours and pay in retaliation.  Ex. 11 (Affidavit of Alejandro Rodriguez) ¶¶ 11-13.

68.     Defendant Chung Cho was arrested for his conduct, but was granted accelerated rehabilitation on the condition that he pay the workers back

**their unpaid wages for the period of time audited by the Department of Labor and write them a letter of apology for underpaying the Plaintiffs and other employees.  Ex. 13 (Judge Keegan Decision on Accelerated Rehabilitation); Ex. 14 (Apology Letter from Chung Cho).**