## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Ulber Morales, Julio Olivar, | : |
| Hisai Ramirez, | : |
| Alejandro Rodriguez, | : |
| Cristian Ramirez, | : |
| and Misael Morales | : |
| | : CIVIL ACTION NO: 3:14-cv-01333-VLB |
| Plaintiffs, | : |
| v. | : |
| | : |
| Gourmet Heaven, Inc., Yong Cho, | : |
| and Chung Cho | : |
| | : April 15, 2016 |
| | : |
| Defendants | : |
| | : |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS CHUNG CHO and GOURMET HEAVEN, INC.

Plaintiffs worked for Defendants in their food market for many years and were significantly undercompensated for their hard work.  Minimum wage and overtime cases can be very complicated, but this one is not.  Plaintiffs respectfully request that the Court find in their favor, and order Defendants to pay what they owe.

In the accompanying Motion, Plaintiffs seek Summary Judgment on their minimum wage and overtime claims, Counts 1-4 of their First Amended Complaint.

## PROCEDURAL HISTORY

On September 15, 2014, Plaintiffs filed this action against Defendants Gourmet Heaven and Chung Cho, alleging violations of the Fair Labor Standards

1

Act ("FLSA") and the Connecticut Minimum Wage Act ("CMWA"). ECF No. 1. Defendants filed an answer on February 4, 2015. ECF # No. 20. On June 23, 2014, the Court ordered a prejudgment remedy against Defendants in Plaintiffs' favor in the amount of $175,664.12. ECF # 31. On November 16, 2015, the Plaintiffs filed an amended complaint. ECF # 64. On November 24, 2015, the Court issued an amended scheduling order giving the parties until April 1, 2015 to file dispositive motions. ECF # 66. On January 29, 2016, Defendants Gourmet Heaven and Chung Cho filed an Answer to Plaintiffs' Amended Complaint. ECF # 85. On March 18, 2016, the Court extended that deadline to April 15, 2016. ECF #82.

## STATEMENT OF FACTS

Gourmet Heaven, Inc. ("Gourmet Heaven") is a domestic corporation incorporated in Connecticut with a business address of 15 Broadway in New Haven, Connecticut. SOF ¶ 1. Gourmet Heaven did more than $500,000 in business and operated in interstate commerce. *Id*. ¶ 2. Chung Cho was at all relevant times the owner of Gourmet Heaven, its agent for the service of process, and was present at Gourmet Heaven's New Haven locations almost every day of the year. *Id*. ¶ 3. He personally hired all of the managers and supervisory staff at the New Haven Gourmet Heaven locations, as well as other employees. *Id*. ¶ 4. Mr. Cho personally paid employees, conducted salary negotiations with employees, and handled certain employees' scheduling. *Id*. ¶ 5. Mr. Cho invested the funds required to establish the business, negotiated the lease of the business, conducted much of the banking and other financial affairs

of the business, and conducted the day-to-day affairs of the business.  *Id*. ¶ 6.  In addition, Mr. Cho himself negotiated the sale of the business and all of the assets.  *Id*. ¶ 7.

<u>**DOL Investigation**</u>

In June of 2013, the Connecticut Department of Labor began investigating Gourmet Heaven for alleged wage and hour violations after a complaint from Plaintiff Ulber Morales.  *Id*. ¶ 8.  Once Defendant Chung Cho learned of DOL complaint, he ordered other workers to convince him to withdraw the complaint. *Id*. ¶ 9.  Defendant Cho told the other workers that if Mr. Morales did not withdraw the complaint, police and immigration authorities would arrest and detain them.  *Id*. ¶ 10.  After the workers were unable to locate Mr. Morales, Defendant Chung Cho called them into his office where he told them to lie about how much they had earned in order to frustrate the investigation.  *Id*. ¶ 11. Chung Cho and other managers told employees to run out the back door if Department of Labor investigators arrived at the store.  *Id*. ¶ 12.

Blair Bertaccini, who had worked as a wage and hour investigator and subsequently as a wage enforcement agent for twenty-five years, was in charge of the investigation.  *Id*. ¶ 13.  Mr. Bertaccini found that the Defendants did not post the legally-required notices of wage and hour rights or otherwise inform employees of their wage and hour rights.  *Id*. ¶ 14.  He also found that the Defendants paid the Plaintiffs, all of whom were employees, in cash.  *Id*. ¶ 15.

At the beginning of the investigation, Defendant Chung Cho produced employment records of only a limited group of employees.  *Id*. ¶ 16.  Mr.

Bertaccini found out through his investigation that there were more employees working at night, and at another Gourmet Heaven location, for whom Defendant Chung Cho had produced no records. *Id*. ¶ 17. When Mr. Bertaccini asked for records for those employees, Defendant Cho finally produced those, as well. *Id*. ¶ 18.

During his investigation, Mr. Bertaccini audited handwritten records Mr. Cho maintained for his employees, including the Plaintiffs. *Id*. ¶ 19. These records recorded cash payments made to the employees and sometimes included weekly totals of hours. *Id*. ¶ 20. At times Mr. Bertaccini relied on his experience and questioning of Defendant Chung Cho as to exactly what the records indicated. *Id*. ¶ 21. Mr. Bertaccini determined that the employment records maintained by Mr. Cho were incomplete and out of compliance with state law standards. *Id*. ¶ 22. Nevertheless, Mr. Bertaccini was able to determine how many hours each employee worked and how much they were paid during the period covered by the audit. *Id*. ¶ 23.

After performing the audit, Mr. Bertaccini counseled Mr. Cho about how to comply with state overtime law going forward. *Id*. ¶ 24. He also transcribed the data on to a wage transcription sheet which calculated the overtime wages owed to each employee. *Id*. ¶ 25.

After concluding the initial investigation, counseling Defendants on compliance, and producing a transcription sheet that quantified the amounts owed to each employee, Mr. Bertaccini was informed that Defendants continued to violate the overtime and record-keeping laws. *Id*. ¶ 26. Mr. Bertaccini

determined that the Defendants continued to pay overtime hours in cash, and without an overtime premium.  *Id*. ¶ 27.  This was only the second time in his career as a wage enforcement agent that an employer continued to commit wage and hour violations while having an open case for the same types of offenses.  *Id*. ¶ 28.

<u>**Wage and Hour Violations Found**</u>

Plaintiff Ulber Morales worked for Defendants from July, 2011 through January, 2012 for a total of 25 weeks.  *Id*. ¶ 29.  Defendants paid Mr. Morales as little as $300 for 72 hours of work in a week, and never more than $425 for 72 hours of work.  *Id*. ¶ 30.  The first audit by the Connecticut Department of Labor revealed that Defendants underpaid Mr. Morales by $8,291.  *Id*. ¶ 31.  According to that audit, Mr. Morales worked 72 hours in each and every week during that 25 weeks.  *Id*. ¶ 32.  On average, Defendants underpaid Mr. Morales by $331.64 per week.  *Id*. ¶ 33.

Plaintiff Julio Olivar worked for Defendants from June 4, 2006 until December 21, 2013, for a total of 550 weeks.  *Id*. ¶ 34.  The first audit by the Connecticut Department of Labor revealed that during 2011, Mr. Olivar was paid as little as $500 for 72 hours of work in a week.  *Id*. ¶ 35.  That audit also revealed that over a two-year period, Defendants underpaid Mr. Olivar by $7,163.63.  *Id*. ¶ 36.  During the period of that audit, Defendants underpaid Mr. Olivar an average of $68.62 per week.  *Id*. ¶ 37.  According to that audit, Mr. Olivar worked 72 hours almost each and every week.  *Id*. ¶ 38.  The subsequent audit revealed a further underpayment of $2,152.92.  *Id*. ¶ 39.  Assuming

Defendants underpaid Mr. Olivar at that average rate of $68.82 for 550 weeks, they underpaid him by a total of $37,851 during his tenure.  *Id*. ¶ 40.

Plaintiff Hisai Ramirez worked from the week of January 2012 until December 2013.  *Id*. ¶ 41.  The first audit by the Connecticut Department of Labor revealed that Mr. Ramirez was paid as little as $380 for 60 hours of work in a week.  *Id*. ¶ 42.  That audit also revealed that over a two year period, Defendants underpaid Mr. Ramirez by $12,024.00.  *Id*. ¶ 43.  According to that audit, Mr. Ramirez worked 60 hours each and every week.  *Id*. ¶ 44.  During the period of that audit, 94 weeks in his case, Defendants underpaid Mr. Ramirez by an average of $127.91 per week.  *Id*. ¶ 44.  The subsequent audit revealed another $144 in violations, for a total of $12,168 in state wage and hour violations.  *Id*. ¶ 45.

Plaintiff Alejandro Ramirez worked for Defendants from March 2003 through at least September of 2014.  *Id*. ¶ 46.  When Mr. Rodriguez began working for Gourmet Heaven in March, 2003, he was paid at a rate of $3.33 per hour.  *Id*. ¶ 47.  The first audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Rodriguez by $25,708.  *Id*. ¶ 58.  During the period of the first audit, Mr. Rodriguez was paid as little as $392 for sixty hours of work.  *Id*. ¶ 49.  According to that audit, Mr. Rodriguez worked 72 hours per week almost every single week.  *Id*. ¶ 50.  During the period of the audit, Defendants underpaid Mr. Rodriguez an average of $247.19 per week.  *Id*. ¶ 51.  The subsequent audit revealed a further underpayment of $1,496.32, for a total of $27,204.32.  *Id*. ¶ 52.  Defendants

underpaid Mr. Rodriguez at a rate of $247.19 per week for the 565 weeks between the date he started working for Defendants and the end of the last DOL audit, they underpaid him by a total of $139,662.35. *Id.* ¶ 53.

Plaintiff Cristian Ramirez worked for Defendants from September 1, 2010 under December 21, 2013. *Id.* ¶ 54. An audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Ramirez by $14,982.50. *Id.* ¶ 55. During that period, Mr. Ramirez was paid as little as $325 for sixty hours of work. *Id.* ¶ 56. During that period, Mr. Ramirez worked sixty hours per week almost every single week. *Id.* ¶ 57. Defendants underpaid Mr. Rodriguez an average of $144.06 per week. *Id.* ¶ 58. A subsequent audit revealed a further underpayment of $190, for a total of $15,172.50. *Id.* ¶ 58. Defendants underpaid Mr. Rodriguez at a rate of $144.06 per week during the 172 weeks between the date he started working for Defendants and the end of the last DOL audit, and so owe him by a total of $24,778.32 in unpaid wages. *Id.* ¶ 60.

Plaintiff Misael Morales worked from June 1, 2009 until December 21, 2013. *Id.* ¶ 60. An Audit by the Connecticut Department of Labor revealed that during just a two-year period, Defendants underpaid Mr. Morales by $15,546.75. *Id.* ¶ 61. During that period, Mr. Morales was paid as little as $335 for sixty hours a week of work. *Id.* ¶ 62. During the audit period, Mr. Morales worked 60 hours each and every week. *Id.* ¶ 63. Defendants underpaid Mr. Morales by an average of $148.49 per week. *Id.* ¶ 63. A subsequent audit revealed a further underpayment of $160, for a total of $15,706.75. *Id.* ¶ 64. Defendants underpaid

Mr. Mr. Morales $148.49 per week for his entire tenure of 237 weeks, and therefore underpaid him by a total of $35,192.13.  *Id*. ¶ 65.

### Aftermath of the DOL Investigation

Immediately following the second DOL audit, in  December of 2015, a manager warned Alejandro Rodriguez not to attend meetings of Unidad Latina en Acción, and was told "if you go again, the boss will be mad and tell you 'there's no more work for you,' if you don't go again, he will treat you well."  *Id*. ¶ 66.  Upon eventually learning of Alejandro Rodriguez's continued participation in meetings with Unidad Latina en Acción, and the fact that Mr. Rodriguez himself had complained about his substandard wages, Defendants reduced Mr. Rodriguez's hours and pay in retaliation.  Id. ¶ 67.

Defendant Chung Cho was arrested for his conduct, but was granted accelerated rehabilitation on the condition that he pay the workers back their unpaid wages for the period of time audited by the Department of Labor and write them a letter of apology for underpaying the Plaintiffs and other employees.  Id. ¶ 68.

### STANDARD OF REVIEW

A party is entitled to summary judgment where it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit."  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a

"material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists," the moving party "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994)(citing *Celotex*, 477 U.S. at 325).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d 1224.

Once the moving party has met its initial burden of demonstrating that there are no disputed issues of material fact, the nonmoving party may only defeat summary judgment by "com[ing] forth with specific facts, supported by non-conclusory, admissible evidence, that demonstrate the existence of a dispute of material fact." *Wolinsky v. Standard Oil of Conn.*, *Inc.,* 712 F. Supp. 2d 46, 51 (D. Conn. 2010)(citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party.  If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986)(internal citations omitted).

## ARGUMENT

I.     **Plaintiffs Are Entitled to Judgment as a Matter of Law as to their FLSA Minimum Wage and Overtime Claims against Defendants Gourmet Heaven, Inc. and Chung Cho.**

Plaintiffs Morales worked long hours at Gourmet Heaven, yet Defendants

willfully underpaid them in violation of federal law.  Defendants Gourmet

Heaven, Inc. and Chung Cho were subject to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq., which establishes minimum wage and

overtime obligations for employers.  The uncontroverted evidence

demonstrates that Plaintiffs' minimum wage and overtime rights were

violated by Defendants Gourmet Heaven and Chung Cho.

### A.   Gourmet Heaven was an enterprise engaged in interstate commerce

The minimum age and overtime provisions of the FLSA protect

"employees who (1) are personally engaged in interstate commerce ('individual

coverage') or (2) are employed by an enterprise that is engaged in interstate

commerce or in the production of goods for interstate commerce ('enterprise

coverage').  *Marin v. JMP Restoration Corp.*, 09-cv-1384 CBA VVP 2012 WL

4369748, at *3 (E.D.N.Y. Aug. 24 2012)(citing 29 U.S.C. § 207(a)(1); *Wirtz v.

Melos Construction Corp.*, 408 F.2d 626, 627 (2d Cir. 1969)).  "Commerce" under

the FLSA is "trade, commerce, transportation, transmission, or communication

among the several states or between any state and any place outside thereof."

29 U.S.C. § 203(b).  An "enterprise engaged in commerce or in the production of

goods for commerce" is one that has "employees engaged in commerce or in

the production of goods for commerce, or that has employees handling, selling,

or otherwise working on goods or materials that have been moved in or

produced for commerce by any person," and whose annual gross volume of

sales equals or exceeds $500,000.  Id. §§ 203(s)(1)(A)(i)-(ii).

Here Defendant Gourmet Heaven has admitted that it did more than

$500,000 in business and that it purchased and used food and other products

that originated outside of Connecticut and therefore that it was an enterprise

engaged in enterprise coverage pursuant to the FLSA.  Ex. 1 (First Amended

Complaint) ¶¶ 11, 13, 14, 15; Ex. 2 (Answer to Amended Complaint) ¶¶ 11, 13, 14,

15.

## B. Gourmet Heaven and Chung Cho were Plaintiffs' employers for purposes of the FLSA

### 1.   The FLSA's remedial and humanitarian goals require the Court to interpret its coverage expansively

The FLSA is a "remedial statute," *Young v. Cooper Cameron Corp.*, 586

F.3d 201, 204 (2d Cir. 2009), passed by Congress with the primary purpose of

combatting unemployment and protecting workers from abusive working

conditions.  *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945*); Brooklyn

Sav. Bank v. O'Neil*, 324 U.S. 697, 706-707 & n.18 (1945); *Carter v. Dutchess

Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  To achieve these remedial and

humanitarian ends, Congress expansively defined the terms "employee,"

"employer," and "employ," so that the FLSA would apply to as many workers and employers as possible.  *Carter*, 735 F.2d at 12 ("The [FLSA] is a remedial [statute], written in the broadest possible terms so that the minimum wage provisions would have the widest possible impact in the national economy."), *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973)(noting "the expansiveness of the [FLSA]'s definition of 'employer'"); *Frankel v. Bally, Inc.*, 987 F2d 86, 89 (2d Cir. 1993)(noting the "expansive nature of the FLSA's definitional scope"); *Brock v. Superior Care, Inc.* 840 F.2d 1054, 1058 (2d Cir. 1988)(noting the definition of "employ" is "necessarily a broad one in accordance with the remedial purpose of the Act").  As the Supreme Court has recognized, "[a] broader or more comprehensive coverage of employees…would be difficult to frame."  *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945).

The FLSA defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employer" as "any person acting directly or indirectly in the interest of an employer."  29 U.S.C. § 203(d).  The Act defines "employ" as including "to suffer or permit to work," 29 U.S.C. § 203(g), reflecting the FLSA's "striking breadth" and Congress's intent to "stretch[]…the meaning of 'employee' to cover some parties who might no qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut. Ins. Co. v. Darden*, 503, U.S. 318, 326 (1992).  The Supreme Court "has consistently construed the [FLSA] liberally to apply to the furthest reaches consistent with congressional direction."  *Tony & Susan Alamo Found. V. Sec'y of Labor*, 471 U.S. 290, 296 (1985).

### 2.  Gourmet Heaven was Plaintiffs' employer under the FLSA

Defendant Gourmet Heaven has admitted that it hired, paid, supervised, and scheduled Plaintiffs and was therefore their employer pursuant to the FLSA. Ex. 1 (First Amended Complaint) ¶ 15; Ex. 2 (Answer to Amended Complaint) ¶ 15.

### 3.  Chung Cho is individually liable as an employer under the FLSA

The FLSA provides for both corporate and personal liability in employment cases.  As with corporate liability under the FLSA, "in the individual-liability context…the remedial nature of the [FLSA]…warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir. 2013)(*quoting Herman v. RSR Sec. Servs., Ltd*, 172 F.3d 132, 139 (2d Cir. 1999). The broad remedial goals of the Act would be unattainable "absent a financial incentive for individuals with control…to comply with the law," and for this reason, even in the individual-liability context, "courts have continually emphasized the extraordinarily generous interpretation the statute is to be given."  *Id*.

When assessing "whether an individual within a company that undisputedly employs a worker is personally liable as the worker's 'employer,'" id. At 105, the Second Circuit considers the four factors of the *Carter* economic reality test and the *Irizarry* "operational control" test.

### a.   Chung Cho qualifies as an employer under the *Carter* economic reality test

As the Supreme Court established in *Goldberg v. Whitaker House Co-op, Inc.*, the test for whether a person or entity is an employer under the FLSA is a matter of "economic reality."  366 U.S. 28, 33 (1961).  An individual qualifies as an employer under the FLSA when, as a matter of economic reality, he had the power to control the workers in a given case.  *See RSR*, 172 F.3d at 139; *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control 'do[] not diminish the significance of its existence."  RSR, 172 F.3d at 139 (quoting *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982)).  To determine whether an individual or entity exercises sufficient control to qulify as an employer, the Second Circuit has traditionally employed the four-factor test laid out in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984).

Under *Carter*, the relevant factors of economic reality include "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  The four factors are considered holistically, in light of the "totality of the circumstances," and the existence or non-existence of any one factor is not dispositive.  *RSR*, 172 F3d at 139.  The *Carter* factors "can be sufficient to establish employer status," but a "positive finding on those four factors is [not] necessary to establish an employment relationship.  *Zheng v.*

*Liberty Apparel Co.*, 335 F.3d 61, 75 (2d Cir. 2003).  Courts have granted summary judgment even where some of the Carter factors weigh against a finding of an employment relationship.  *See, e.g., Irizarry v. Catsimatidis*, 722 F.3d 99, 116 (2d Cir. 2013)(affirming district court's summary judgment ruling that defendant was an employer under the FLSA where only two of the Carter factors were met); *see also Zheng*, 355 F.3d at 77 (noting that summary judgment may be granted to plaintiffs "even when isolated factors point against imposing…liability").

The undisputed facts demonstrate that Chung Cho satisfied all four of these factors.  Chung Cho personally hired all the managers, supervised the employees, scheduled some of the employees,  negotiated employee salaries, and maintained employee records.  With all four factors weighing in favor a finding of an employment relationship, the application of the *Carter*  test indicates that Chung Cho was Plaintiffs' employer under the FLSA.

### b.  Chung Cho also qualifies as an employer under the *Irizarry* "operational control" test.

In *Irizarry v. Catsimatidis*, the Second Circuit addressed the precise question at issue here, namely "whether an individual within a company that undisputedly employs a worker is personally liable as that worker's 'employer.'" 722 F.3d 99, 105 (2d Cir. 2013), *cert denied*, 134 S. Ct. 1516 (U.S. 2014).  In such a case, "economic reality" is still the guiding mandate and the Carter factors are still to be considered, but the important question to be answered is whether the purported employer had "operational control" over the plaintiff employees.  The *Irizarry* court described what qualifies as "operational control" as follows:

> A person exercises operational control over the employees if his or
> er role within the company, and the decisions it entails, directly
> affect the nature or conditions of the employees' employment.
> Although this does not mean that the individual "employer" must be
> responsible for managing plaintiff employees –or, indeed, that he or
> she must have directly come into contact with the plaintiffs, their
> workplace, or their schedules-the relationship between the
> individual's operation function and the plaintiffs' employment must
> be closer in degree that simple but-for causation.

*Irizarry*, 172 F.3d at 110.  If the purported employer exercises "operational control" so defined – if he has "authority over management, supervision, and oversight of [the business's] affairs in general," id. at 111, then he is an employer for purposes of the FLSA.

Chung Cho indisputably possessed "operational control."  He was at all relevant times the owner of Gourmet Heaven, its agent for the service of process, and was present at Gourmet Heaven's New Haven locations almost every day of the year.  He personally hired all of the managers and supervisory staff at the New Haven Gourmet Heaven locations.  This is a fact emphasized as particularly important in both *Irizarry* and *RSR*.  *See Irizarry*, 772 F.3d at 116; *RSR*, 172 F.3d at 136-137.  Mr. Cho also  personally paid employees from time to time and conducted salary negotiations with employees.  He invested the funds required to establish the business, negotiated the lease of the business, conducted all the banking and other financial affairs of the business, and conducted the day-to-day affairs of the business.  In addition, Mr. Cho himself negotiated the sale of the business and all of the assets.

In sum, it is manifestly evident from the undisputed facts that Defendant Cho had "authority over management, supervision, and oversight of [Gourmet

Heaven's] affairs in general," *id.* at 111, and that he exercised "operational

control over Gourmet Heaven and its employees, including Plaintiffs.

### C. Defendants paid Plaintiffs below minimum wage and failed to pay Plaintiffs overtime wages in violation of the FLSA

#### 1.  FLSA Minimum Wage and Overtime Liability Generally

##### a.   Minimum Wage Liability

At all times relevant to the Complaint, the minimum wage under the FLSA

was $7.25 per hour.  29 U.S.C. § 206(a)(1).

##### b.  Overtime Liability

"In general, the FLSA provides that an employee who works more than

forty hours in a given week is entitled to compensation at 'one and one-half

times the regular rate at which he is employed." *Costello v. Home Depot USA,*

*Inc.*, 944 F. Supp. 2d 1992, 202 (D. Conn. 2013)(quoting 29 U.S.C. § 207(a)).  An

employee's regular rate is "the hourly rate actually paid the employee for the

normal, non-overtime workweek for which he is employed." *Walling v.*

*Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945); 29 C.F.R. §

778.108.  However, "[w]here a higher minimum wage than that set in the [FLSA]

is applicable to an employee by virtue of...other legislation, the regular rate of

the employee...cannot be lower than such applicable minimum, for the words

'regular rate at which he is employed'...must be construed to mean the regular

rate at which he is lawfully employed."  29 C.F.R. § 7789.5.  Because the

Connecticut minimum wage at all times relevant to the Complaint was higher

than that of the FLSA, Conn. Gen. Stat. § 31-58(i), Plaintiffs were entitled to at

least compensation at a rate of one-and-a-half times the Connecticut minimum wage.

### c.  Exemptions

The FLSA exempts certain employees from minimum wage and maximum hour (overtime) protections.  29 U.S.C. § 213.  However, exemptions are affirmative defenses that must be specifically pleaded, otherwise they are waived.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-197 (1974)("[T]he application of an exemption under the [FLSA is a matter of affirmative defense on which the employer has the burden of proof").  Defendants have not pled an exemption, and rightfully so, as no exemption applies here.

### 2.  Defendants did not pay minimum wage or overtime to Plaintiffs

Defendants failed on numerous occasions to even pay the federal minimum wage to Plaintiffs.  For example, Defendants:

    a)  Paid Ulber Morales $300 for 72 hours of work in a week;

    b)  Paid Julio Olivar $500 for 72 hours of work in a week;

    c)  Paid Hisai Ramirez $380 for 60 hours of work in a week;

    d)  Paid Alejandro Rodriguez $392 for sixty hours of work; and

    e)  Paid Cristian Ramirez $325 for sixty hours of work.

In each example, listed, Defendants paid Plaintiffs less than $7.25 per hour, and therefore are liable for minimum wage violations.  In addition, the undisputed evidence shows, and the examples above demonstrate, that Defendants failed to pay Plaintiffs an overtime premium for hours over 40, in violation of FLSA's **maximum hours provisions.**

**II.    Plaintiffs are entitled to Judgment as a Matter of Law as to their CMWA Minimum Wage and Overtime Claims**

The Connecticut Minimum Wage Act ("CMWA"), codified at Conn. Gen. Stat. §§ 31 et seq., regulates the payment of wages, as well as overtime compensation.   The elements of a CMWA minimum wage or overtime violation are largely similar to those of the FLSA, with the exception that there is no interstate commerce requirement.  The undisputed facts in this case demonstrate that Defendants Gourmet Heaven and Chung Cho failed to comply with the CMWA, and Plaintiffs are therefore entitled to judgment as a matter of law on their CMWA minimum wage and overtime claims.

**A.   Defendants Gourmet Heaven and Chung Cho were Plaintiffs' employers for purposes of the CMWA**

Like the FLSA, the CMWA 'is remedial, and…must be given a liberal construction in favor of those whom the legislature is intended to benefit." *Tianti ex. Rel. Gluck v. William Raveis Real Estate, Inc*., 231 Conn. 690, 695 (1995)(quoting *Chrysler corp. v. Maiocco*, 209 Conn. 579, 595)).  The CMWA also defines "employ" as "to employ or suffer to work," Conn. Gen. Stat. § 31-58(g), and parallels the FLSA's breadth with nearly identical definitions of "employee" and "employer."  Conn. Gen. Stat. § 31-58.  Courts construe the CMWA with reference to the FLSA's standards.  *See Scott v. Aetna Servs., Inc*., 210 F.R.D. 261, 263 n.2 (D. Conn. 2002)("[T]he [CMWA]…provides wage and overtime guarantess similar to the FLSA.");  *Hendricks v. J.P. Morgan Chase Bank, N.A*, 677 F. Supp. 2d 544, 560 (D. Conn. 2009)("[T]he Connecticut Supreme Court has indicated that federal precedent can be used to interpret Connecticut laws that

are analogous to provisions contained in the FLSA." (citing *Roto-Rooter Servs. Co. v. Dep't of Labor*, 219 Conn. 520, 528 n.8 (1991)).

### 1.   Gourmet Heaven was Plaintiffs' Employer under the CMWA

Defendant Gourmet Heaven has admitted that it hired, paid, supervised, and scheduled Plaintiffs and was therefore their employer pursuant to the CMWA.  Ex. 1 (First Amended Complaint) ¶ 15; Ex. 2 (Answer to Amended Complaint) ¶ 15.

### 2.   Chung Cho was Plaintiffs' Employer under the CMWA

Connecticut's Supreme Court has held that the term "employer" as used in Conn. Gen. Stat. 31-72 encompasses as individual who has set the hours of employment, pays wages, and "is the specific cause of the wage violation." *Butler ex rel. Skidmore v. Hartford Tech. Inst., Inc.* 243 Conn. 454, 463-464 (1997).  Moreover, the Connecticut Supreme Court has emphasized that the term "employer" should be given a broad interpretation and "must be given a liberal construction in favor of those whom the legislature intended to benefit." *Id*. at 463.

As discussed at length above, the undisputed facts that Chung Cho exercised operational control over the store and its employees, and personally negotiated Plaintiffs' wages, making him the "specific cause of the wage violation." *Butler*, 243 Conn. at 263-264.  As such, Defendant Cho was Plaintiffs' employer under the CMWA as a matter of law.

**B.  Defendants paid Plaintiffs below minimum wage and failed to pay Plaintiffs overtime wages in violation of the CMWA.**

As explained above, Defendants did not pay Plaintiffs the federal minimum wage, much less the higher Connecticut minimum wage.  Nor did Defendants pay Plaintiffs an overtime premium.  Therefore, Plaintiffs are entitled to judgment as a matter of law that Defendants violated the CMWA minimum wage and overtime provisions.

**III.   Plaintiffs are Entitled to Damages for Their Unpaid Minimum Wages and Overtime, and to separate Awards of Liquidated Damages under both the FLSA and the CMWA.**

**A.  In addition to whatever unpaid wages are still owed, Plaintiffs are entitled to recover federal and state liquidated damages.**

**1.  Federal liquidated damages are owed.**

Both the FLSA and the CMWA include provisions authorizing double ("liquidated") damages.  29 U.S.C. § 216(b); Conn. Gen. Stat § 31-68(a).  Under the FLSA, liquidated damages are not discretionary.  *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 150 (2d Cir. 2008)("a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages").  To avoid these damages, an employer has the burden of pleading and proving that they acted in "good faith" by taking active steps to ascertain he dictates of the law and then acting to comply with them.  29 U.S.C. § 260; *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).  Here, Defendants have neither pleaded nor proven good faith, and so must pay double the $1,177.75 in unpaid wages calculated above.

**2.  State liquidated damages are owed.**

The CMWA also has a liquidated damages provision, and its provisions changed this year to make the award of liquidated damages automatic, rather than discretionary.  Ex. 15 (Public Act 15-86) §2.  The legislature accomplished this primarily by changing the phrase "may recover" to "shall recover."  The current version of Conn. Gen. Stat. § 31-68, regarding civil actions to collect unpaid minimum and overtime wages, provides:

> (a)    If any employee is paid by his or her employer less than the minimum fair wage or overtime wage to which he or she is entitled under sections 31-58, 31-59 and 31-60 or by virtue of a minimum fair wage order **he or she shall recover**, in a civil action, (1) twice the full amount of such minimum wage or overtime wage less any amount actually paid to him or her by the employer, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the underpayment of such wages was in compliance with the law, the full amount of such minimum wage or overtime wage less any amount actually paid to him or her by the employer, with costs and such reasonable attorney's fees as may be allowed by the court.

The prior version of the statute stated:

> Sec. 31-68. Collection of minimum or overtime wage. (a) If any employee is paid by his  sections 31-58, 31-59 and 31-60 or by virtue of a minimum fair wage order **he may recover**, in a civil action, twice the full amount of such minimum wage less any amount actually paid to him by the employer, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer to work for less than such minimum fair wage or overtime wage shall be no defense to such action.

Under the previous language of the statute, under which an employee "**may** recover" liquidated damages, "it [was] well established ... that it is appropriate for a plaintiff to recover attorneys fees, and double damages under [§ 31–68], only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." (Internal quotation marks omitted.)

*Schoonmaker v. Lawrence Brunoli*, Inc., 265 Conn. 210, 269, 828 A.2d 64 (2003), *quoting Sansone v. Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991).  Now the statute provides liquidated damages **shall** be awarded, absent conclusive employer proof of a good-faith belief in its compliance with the law.  By making liquidated damages automatic rather than discretionary, the legislature shifted the burden in favor of the plaintiff, but did not alter the substantive cause of action.  It is true that this statutory change took place after the Defendants' violations, but because the amendment was remedial and procedural in nature, rather than substantive, it should be given retroactive effect.

The Connecticut Supreme Court has repeatedly characterized the CMWA as a remedial statute. "The state wage collection statute is, like the Fair Labor Standards Act, a remedial statute that is entitled to liberal construction." *Schoonmaker v. Lawrence Brunoli, Inc.* (2003) 828 A.2d 64, 265 Conn. 210. "As a remedial statute, the wage collection statute  . . . must be construed broadly in favor of employees whom legislature intended to benefit." *Commissioner of Labor v. C.J.M. Services, Inc.* (2002,) 806 A.2d 1105, 73 Conn.App. 39, *certification granted in part* 812 A.2d 862, 262 Conn. 921, *affirmed in part*, *reversed in part* , 842 A.2d 1124, 268 Conn. 283.  Likewise, the amendment to Conn. Gen. Stat. 31-68 is remedial and procedural in nature, rather than substantive.

Remedial and procedural statutes are normally given retroactive effect, while an amendment which brings about substantive rights is not subject to retroactive application.  *Inv. Associates v. Summit Associates, Inc.*, 309 Conn.

840, 870, 74 A.3d 1192, 1211 (2013)(statute reviving judgments that had otherwise expired by lapse of time was procedural, hence retroactive); *Davis v. Forman Sch.*, 54 Conn. App. 841, 854-59, 738 A.2d 697, 706-09 (1999)(legislative amendment of the workers compensation laws so as to provide a penalty for late payment of an award was remedial and procedural, hence given retroactive effect). Statutory change directed at a remedy, rather than a right, is typically applied retroactively:

> The rule of presumed legislative intent is not . . . applied to legislation that is general in its terms, affects only matters of procedure and does not impose new obligations or affect the substantive rights of the parties. *Beach v. Regional School District Number 13*, 42 Conn.App. 542, 547, 682 A.2d 118, cert. denied, 239 Conn. 939, 684 A.2d 710 (1996); *Schurgast v. Schumann*, 156 Conn. 471, 487, 242 A.2d 695 (1968); *Toletti v. Bidizcki*, 118 Conn. 531, 536, 173 A. 223 (1934). "While there is no precise definition of either [substantive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." *Romano v. B.B. Greenberg*, 108 R.I. 132, 136, 273 A.2d 315 (1971); *Richardson v. Honda Motor Co., Ltd.*, 686 F.Supp. 303, 304 (M.D.Fla.1988); see Black's Law Dictionary (6th Ed.1990). Where the amendment is not substantive, i.e., not directed to the right itself, but rather to the remedy, it is generally considered a distinctly procedural matter. *Miller v. Kirshner*, 225 Conn. 185, 204, 621 A.2d 1326 (1993).

*Davis v. Forman Sch.,* 54 Conn. App. 841, 854-59, 738 A.2d 697, 706-09 (1999)(emphasis added). As in *Davis*, the amendment of § 31-68 is directed not at the underlying right, but at the remedy, and therefore applies retroactively. Under the new standard, Defendants must pay state liquidated damages because they did not have a "good faith belief that the underpayment of such wages was in compliance with the law." Conn. Gen. Stat. 31-68.

But even were the Court to apply the older standard, state liquidated damages should still be awarded because "Defendants continued to violate

minimum wage laws while having an open criminal case for the same offenses." *Morales et al. v. Gourmet Heaven, et al.*, 2015 WL 3869419, at *2, (D.Conn. 2015)(VLB).

### 3. The Court should award federal and state liquidated damages simultaneously

The Court has repeatedly expressed the view that victims of wage and hour violations are allowed to simultaneously receive federal and state liquidated damages. *Morales et al. v. Gourmet Heaven, et al.*, 2015 WL 3869419, at *2, (D.Conn. 2015)(VLB); *Tapia et al. v. Mateo et al.*, 96 F.Supp.3d 1, (D.Conn. 2015)(VLB). The Court's view is now the majority view in this District. See, e.g., *Pau v. Chau, et al.*, 2015 WL 6386508, at *11, (D.Conn 2015)(JBA)("Thus, while the practical effect of both the FLSA's and CMWA's liquidated damages provisions may be to deter employers from violating the law, they are in fact intended to serve fundamentally different purposes, and for this reason, Plaintiff may recover liquidated damages under both the FLSA and the CMWA.")

### B. Plaintiffs are owed different amounts.

#### 1. Defendants owe Plaintiff Ulber Morales $16,782.

According to the Department of Labor audit, Defendants underpaid Plaintiff Ulber Morales by $8,291. Defendants paid that amount as a condition of receiving accelerated rehabilitation. However, Defendants still owe Mr. Morales:

        a) $8,291 in state liquidated damages

        b) $8,291 in federal liquidated damages.

In total, therefore, Defendants owe Ulber Morales $16,582

## 2.  Defendants owe Plaintiff Julio Olivar $104,236.45.

According to the first Department of Labor audit, Defendants underpaid Plaintiff Julio Olivar by $7,163.63.  The second Department of Labor audit found a further underpayment of $2,152.92.  Defendants paid Defendants paid Mr. Olivar that $9,316.55  as a condition of receiving accelerated rehabilitation, although they did not pay state or federal liquidated damages.  Defendants underpaid Mr. Olivar an average of $68.62 per week.

However, Mr. Olivar can make a claim for his *entire time* working at Gourmet Heaven, a total of 550 weeks, "because the FLSA's limitations period, like most such statutory provisions, creates an affirmative defense that is forfeited if not raised in a defendant's answer or an amendment thereto," *See Day v. McDonough*, 547 U.S. 198, 202, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006); *Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir.1987); *Archie v. Grand Cent. P'ship, Inc.*, 997 F.Supp. 504, 536 (S.D.N.Y.1998), and Defendants have not raised that defense.

The same is true under state law:  "ordinarily, a defendant must plead the failure to meet the applicable statute of limitations as an affirmative defense, and the defendant bears the burden of proving the elements of the defense by a preponderance of the evidence." *St. Paul Traveler's Companies, Inc. v. Kuehl*, citing *State v. Figueroa*, 235 Conn. 145, 177–78, 665 A.2d 63 (1995).  Defendants never pled such a defense.

Over the course of 550 weeks, Defendants underpaid Mr. Olivar by $37,851 (550 x $66.82 = $37,851).  Therefore, Defendants owe Mr. Olivar:

a)  $28,534.45 in unpaid minimum wages and overtime ($37,851 owed for 550 weeks minus $9,316.55 already paid);

b)  $37,851 in state liquidated damages

c)  $37,851 in state liquidated damages

In total, Defendants owe Mr. Olivar $104,236.45.

### 3.  Defendants owe Plaintiff Hisai Ramirez $24,336.

The Connecticut Department of Labor found that Defendants underpaid Hisai Ramirez by $12,024 in its first audit, and another $144 in its second audit, resulting in a total underpayment of $12,168.  Defendants paid that amount as a condition of being granted accelerated rehabilitation.  Defendants still owe Hisai Ramirez:

a)  $12,168 in federal liquidated damages; and

b)  $12,168 in state liquidated damages.

In total, Defendants owe Hisai Ramirez $24,336.

### 4.  Defendants owe Plaintiff Alejandro Rodriguez $391,782.73.

In its first audit, the Connecticut Department of Labor found that Defendants underpaid Alejandro Rodriguez by a total of $25,708.  In a second audit, the Department found a further underpayment of $1,496.32, resulting in a total underpayment of $27,204.32.   Defendants paid Mr. Rodriguez that amount as a condition of receiving accelerated rehabilitation.

The average weekly underpayment was $247.17.  Like Mr. Olivar above, Mr. Rodriguez is allowed to make a claim for his full tenure at Gourmet Heaven,

which was 565 weeks.  During that period, Defendants underpaid him by a total of $139,662.35.  Defendants therefore owe Mr. Rodriguez:

a) $112,458.03 in minimum wages and overtime due ($139,662.35 – 27,204.32);

b) $139,662.35 in federal liquidated damages; and

c) $139, 662.35 in state liquidated damages.

In total, Defendants therefore owe Mr. Rodriguez $391,782.73.

### 5.  Defendants owe Cristian Ramirez $59,162.46

The Connecticut Department of Labor found in its initial audit that Defendants underpaid Cristian Ramirez by $14,982.50.  The subsequent audit found an additional underpayment of $190, for a total underpayment of $15,172.50.  Defendants paid that amount of money as a condition of receiving accelerated rehabilitation.  The average weekly underpayment was $144.06.  As with Mr. Olivar and Mr. Rodriguez, Mr. Ramirez is entitled to make a claim for his entire tenure with Defendants, which lasted 172 weeks.  During that time, Defendants underpaid Mr. Ramirez by $24,778.32.  Defendants therefore owe Mr. Ramirez:

a) $9,605.82 in unpaid minimum wage and overtime damages (24,778.32 – 14,982.50);

b) $24,778.32 in federal liquidated damages; and

c) $24,778.32 in state liquidated damages.

In total, therefore, Defendants owe Mr. Ramirez $59,162.46.

### 6.  Defendants owe Misael Morales $89,869.64.

The Connecticut Department of Labor found in its initial audit that Defendants underpaid Misael Morales by $15,546.75.  A subsequent audit found an underpayment of $160, for a total of $15,706.75.  Defendants paid that amount as a condition of receiving accelerated rehabilitation.  As explained above, Mr. Morales is entitled to damages for his entire tenure of 237 weeks, during which time he was underpaid by a total of $35,192.13.  Therefore, Defendants owe Mr. Morales:

     a)  $19,485.38 in unpaid wages  ($35,192.13 - $15,706.75);

     b)  $35,192.13 in federal liquidated damages; and

     c)  $35,192.13  in state liquidated damages.

In total, therefore, Defendants owe Mr. Morales $89,869.64.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the Motion for Partial Summary Judgment on Counts 1-4 of their Complaint and award them damages in the following amounts:

     1)  $16,782 to Ulber Morales;

     2)  $104,236.45 to Julio Olivar;

     3)  $24,336 to Hisai Ramirez;

     4)  $391,782.73 to Alejandro Rodriguez;

     5)  $59,162.46 to Cristian Ramirez; and

     6)  $89,869.64 to Misael Morales.

Plaintiffs seek a total award, therefore, of $686,159.28.

Respectfully submitted,

THE PLAINTIFFS


By:     /s/_____
        James Bhandary-Alexander
        ct28135
        New Haven Legal Assistance Assoc.
        426 State Street
        New Haven, CT 06510
        (203) 946-4811
        (203) 498-9271 fax
        Email: jbhandary-alexander@nhlegal.org
        Their Attorney